562 COURT OF COMMON PLEAS.

The New York and Harlem Railroad Co. v. The Mayor, &c., of New York.

THE NEW YORK AND HARLEM RAILROAD COMPANY *v.* THE MAYOR, ALDERMEN, AND COMMONALTY OF THE CITY OF NEW YORK, THE BOARD OF COMMISSIONERS OF THE METROPOLITAN POLICE DISTRICT, and FREDERICK A. TALLMADGE, Superintendent, &c.

This court has jurisdiction of all actions against the corporation of the city of New York, upon any cause of action whatever, whether it be of a legal or equitable nature.

*So held* in an action to restrain the enforcement of an ordinance of the corporation, upon the ground that it was passed in violation of an agreement entered into by the corporation with parties affected by the ordinance: and also that it was illegal and unauthorized by law.

The Board of Metropolitan Police Commissioners are not state officers, within the meaning of Chap. 488 of Laws of 1851, p. 920. They are officers of a locality or district, and, in a proper case, may be restrained by this court, in the exercise of its equity powers, in like manner and to the like extent as other local or county officers.

The only limitation upon the legislative power and control of the corporation of New York city over the streets within its limits is, that they shall be appropriated to no use or purpose which is not alike free and common to all travellers. This power cannot be surrendered, either in whole or in part, into the hands of any person or persons, without previous legislative sanction.

*It seems* that converting the streets to railroad purposes, and permitting rail tracks to be laid upon them, and used by an association or individuals for carrying merchandise or passengers for hire, is devoting them to an exclusive use, and cannot be permitted without the express authority of the legislature.

And although the power to grant this permission must be derived from the legislature, yet the corporation, by exercising it, is not deprived of its control over the streets in all other respects; and it may, in the grant, impose such conditions respecting the manner in which the rail tracks shall be used, and upon which the future use thereof shall depend, as it may think proper.

By the act of the legislature incorporating the N. Y. & H. R. R. Co., passed April, 1831 (Laws 1831, p. 323), it was provided, that nothing contained in it should authorize the construction of their railway across or along any of the streets of the city of New York without the consent of the mayor, &c., who were thereby authorized to grant permission to so construct it, or to prohibit its construction; and, if constructed, to regulate the time and manner of using the same, and the speed with which carriages might move on it.

In December, 1831, on the application of the company, an ordinance was adopted by the mayor, &c., permitting the track to be laid in certain streets, providing,

The New York and Harlem Railroad Co. v. The Mayor, &c., of New York.

however, that if, after its construction, it should, in the opinion of the mayor, &c., constitute an obstruction or impediment to the future regulation of the city, or the ordinary uses of any street or avenue, the company should forthwith provide a satisfactory remedy therefor, or remove the rails; and, also, expressly reserving and retaining to the mayor, &c., the right to regulate the description of propelling power to be used on the track, and the speed of the same, as well as all other power reserved in the act of incorporation. The ordinance was to have no binding force, or go into effect, until the railroad company, in writing and under seal, covenanted to abide by and perform its conditions. An agreement of this nature was executed and filed in the office of the city comptroller, and thereupon the company laid their track on the Fourth avenue and other streets. In December, 1854, the mayor, &c., of New York prohibited the running of steam engines, or locomotives, on the track of the company on Fourth avenue south of Forty-second street, after eighteen months from that time.

*Held*, 1. That the ordinance was valid, and was not a violation of any of the franchises granted to the railroad company.

2. That granting permission to lay the track did not deprive the mayor, &c., from subsequently regulating its use by the company.

3. That the agreement of the company was valid as a *restriction* upon its corporate power, and was in no sense a *transfer* of it.

4. That the corporation can make no valid contract which will interfere with its legislative control over the streets; and any such contract, if made, is revocable at its pleasure.

A party, applying to a court for the application of its equitable powers. should be held to the rule, "that he who seeks equity must do equity." He will not be allowed found his claim upon a permission in a contract, while he repudiates the conditions upon which the permission was granted.

A corporation, like an individual, may be bound by an implied contract, provided the subject matter of it is within the scope of its corporate authority.

Courts are bound to assume, where a discretion is vested in a municipal body, exercising functions of a legislative character, that good reasons existed for doing an act which was the result of such a discretion.

The duty of enforcing *all* the public ordinances of the city of New York, especially those applicable to police or health, is imposed by law upon the Board of Metropolitan Police Commissioners. The ordinance in question might be classed under either head.

When a motion is brought before the court upon an order to show cause, the order is regarded as a notice of motion, and the party obtaining it entitled to open and close the argument.

*At Special Term, July* 30, 1858.

MOTION for injunction to restrain the enforcement of an ordinance adopted by the corporation of the city, prohibiting the use

564     COURT OF COMMON PLEAS.

The New York and Harlem Railroad Co. v. The Mayor, &c., of New York.

of steam engines, or locomotives, upon the track of the plaintiffs on Fourth avenue, below Forty-second street.

The application was founded upon a complaint duly verified, the substance of which sufficiently appears in the opinion.

The agreement and ordinance, under which the plaintiffs were permitted originally to lay their rail track upon the streets of the city, are as follows:

"Articles of agreement made this ninth day of January, one thousand eight hundred and thirty-two, between the New York and Harlem Railroad Company, parties of the first part, and the Mayor, Aldermen and Commonalty of the city of New York, parties of the second part: Whereas, an ordinance of the Common Council of the city of New York was passed by the Board of Aldermen on the sixteenth day of December last, and by the Board of Assistants on the nineteenth day of December last, and approved by the Mayor of the said city on the twenty-second day of December last, which ordinance is in the words and figures following, to wit: 'A law to authorize the New York and Harlem Railroad Company to construct their railway.

"'Sec. 1. Be it ordained, &c., that the New York and Harlem Railroad Company be, and they are hereby permitted to construct and lay down, in pursuance of their act of incorporation, a double or single track or railroad or railway along the Fourth avenue, from Twenty-third street to the Harlem river, in conformity to a map now on file in the Register's office, and a branch thereof along One Hundred and Twenty-fifth street, from the Fourth avenue to the Hudson river; provided that the width of such double railroad or.way shall not exceed twenty-four feet.

"'§ 2. And be it further ordained, That if, at any time after the construction of the aforesaid railways by the said New York and Harlem Railroad Company, it shall appear to the Mayor, Aldermen and Commonalty of the city of New York, that the said railways, or any part thereof, shall constitute an obstruction

or impediment to the future regulation of the city, or the ordinary uses of any street or avenue (of which the said Mayor, Aldermen and Commonalty shall be the sole judges), the said railroad company, or the directors thereof, shall, on the requisition of the said Mayor, Aldermen and Commonalty, forthwith provide a remedy for the same, satisfactory to the said Mayor, Aldermen and Commonalty; or, if they fail to find such remedy, they shall, within one month after such requisition, proceed to remove such railway or other obstruction or impediment, and to replace the street or avenue in as good condition as it was before the said railway was laid down; and should the said directors decline or neglect to obey such requisition, the said Mayor, Aldermen and Commonalty may, upon the expiration of the time limited in such notice, cause the obstruction or impediment to be removed and the avenues or streets restored, as aforesaid, at the expense of the said railroad company.

" '§ 3. That the right of regulating the description of power to be used in propelling carriages on and along said railways, and the speed of the same, as well as all other power, reserved to the said Mayor, Aldermen and Commonalty, by the act of incorporation of the said company, or any part thereof, be, and the same are hereby expressly retained and reserved.

" '§ 4. That it shall especially be incumbent on the said Harlem Railroad Company, at their own cost, to construct stone arches and bridges for all the cross streets, now or hereafter to be made (which will be intersected by the embankments or excavations of the said railroad), and which in the opinion of the Common Council the public convenience requires to be arched or bridged; and also to make such embankments or excavations, as in the opinion of the Common Council may be required to make the passage over the railroad and embankments at the intersected cross streets easy and convenient, for all the purposes for which streets and roads are usually put to; and also, that the said company shall make, at their own like cost and charges, all such drains and sewers as their embankments or excavations may, in the opinion of the Common Council, make necessary;

all which work to be done under the like requisitions and under like disabilities as in the second section of this ordinance mentioned; and, further, that the said company shall make their railroad path, from time to time, conform to what may hereafter be the regulations of the avenues and roads through which said railroad passes.

" ' § 5. That it shall be incumbent on the said Harlem Railroad Company to commence and complete their said railroad in the respective times allowed for that purpose in their act of incorporation, and unless they commence and complete the same in the periods of time for the said commencement and completion in said incorporation specified, that then the consent of the Common Council and all the powers and privileges given in this ordinance shall cease and be null and void.

" ' § 6. That in case the said railroad should not be completed within the times for that purpose in their charter mentioned, or if, at any time after the construction of the said railroad, the same should be discontinued or not kept up and in repair, as a good and sufficient railroad, that then the strip of land to be taken for the said railroad should be thrown open and become as part of the street or public avenue, without any assessments on the owners of adjoining lands or the public therefor.

" ' § 7. That no building shall be erected on said strip of land to be taken for said railroad, and that such railing or other erections shall be made on the outer edges of the embankments or railroad path, and also such railings or fences on the edges of the excavations, as the Common Council shall from time to time deem necessary to prevent accidents and loss of lives to our fellow-citizens.

" ' § 8. That this ordinance shall not be considered as binding on the Common Council, nor shall the said ordinance go into effect until the said Harlem Railroad Company shall first duly execute (under their corporate seal) such an instrument in writing, promising, covenanting and engaging, on their part and behalf, to stand to, abide by, and perform all the conditions and

requirements in this ordinance contained, as the Mayor and the Counsel of the Board shall by their certificate approve, and not until such instrument shall be filed, so certified, in the Comptroller's office of this city.

" 'Passed by the Board of Aldermen, December 16, 1831.

" 'Passed by the Board of Assistants, December 19, 1831.

" 'Approved by the Mayor, December 22, 1831.'

" *Now, this agreement witnesseth :* That for and in consideration of the premises, and in pursuance of the requirements of the eighth section of the said ordinance, the said parties of the first part do hereby, for themselves and their successors, promise, covenant and engage, to and with the said parties of the second part, and their successors and assigns, to stand to abide by, and perform all the conditions and requirements in the said ordinance contained.

" In witness whereof, the said parties of the first part have hereunto affixed their corporate seal, and caused the same to be signed by their Vice President (in the absence of their President) and attested by their Secretary, the day and year aforesaid.

" JOHN MASON, <em>Vice President.</em>    [L. S.]

" Witness,    ISAAC ADRIANCE,    *Secretary pro. tem.*"

[Endorsed]

" Between the New York and Harlem Railroad Company, and the Mayor, &c., of the City of New York."

" COVENANT.

" We hereby certify that we approve of the within, as being such an instrument in writing as the New York and Harlem Railroad Company are required to execute and file in the Comptroller's office, according to the eighth section of the ordinance within recited.    Dated January 13th, 1832.

" WALTER BOWNE, <em>Mayor.</em>

" R. EMMET, *Counsel, &c.*"

" Filed on Monday, January 16th, 1832.

" T. J. WATERS, Comptroller."

The application was founded upon an order to show cause why an injunction should not be granted of the character stated, and restraining the defendants in the mean time.

The defendants read many affidavits in opposition, to show the representations made by the plaintiffs to the corporation, at various times, when action was being had in respect to the use of their track; the reasons which induced the passage of the prohibitory ordinance; and also showing that the running of steam engines on the track below Forty-second street created a nuisance, injurious to the neighborhood adjacent to Fourth avenue. Affidavits were also read by the plaintiffs, rebutting, to some extent, the new matter set up by the defendants.

After reading these papers, counsel for defendants claimed that, as they appeared under an order to show cause why an injunction should not issue against them, they were entitled to open and close the argument which might be presented upon the hearing of the motion.

The judge, however, held that an order to show cause should be considered as a notice for all the purposes of a motion, and did not at all affect the rights of the parties in respect to the manner in which they should be heard before the court. That, in cases of this kind, the plaintiff should be regarded as the moving party, and, as such, entitled to open and close the argument.

*Charles W. Sandford* and *Charles O'Conor*, for the plaintiffs.

I. The objections touching the jurisdiction of the court, and the fitness of the remedy by injunction, presented by all the defendants, except the corporation of the city of New York, cannot be sustained—

1. It certainly is not now an open question in this court, whether the court has jurisdiction of a suit or action against the corporation of New York. It is "established by law," in the city of New York, and, as such, subject to the jurisdiction of this court. Code, § 33, subd. 3.

2. The 488th chapter of the laws of 1851, p. 920, refers to the

officers and boards mentioned in the fifth article of the consti-
tution. " Public officers of the state " is a phrase which has
been long known in our law, and embraces nearly all the offi-
cers in the state. R. S., part 1, chap. 5. The term "state
officers," or " state board of officers," has been employed in ordi-
nary speech to designate the officers immediately connected with
the administration of the state government. Laws of 1847, p.
395 ; art. 5, § 1 ; marginal note ; *Christman* v. *Floyd*, 9 Wend.
342 ; Const. 1846, art. 4.

*a.* This act is not more properly applicable to district officers
than to county officers.

*b.* If capacity to perform duties in any part of the state, and
being appointed by the state, brings these officers within this
act, all *notaries* are within it.

*c.* The offices in question were created subsequently to the
act of 1851, and, therefore, are not within its purview.

3. Although it is true that equity will not generally interfere
to prevent simple trespasses which may easily be compensated
by·damages, yet, where an act or course of action, which is in
itself no more than a trespass, is, nevertheless, of such a charac-
ter that it breaks up existing arrangements, thus depriving an
individual of his livelihood, or a corporation of the means of
carrying on its operations, and exercising its functions, equity,
seeing that the mischiefs are not likely to be compensated in
damages, and, consequently, are legally irreparable, will inter-
pose its preventive process. Story's Eq. Jur., § 926 ; Drewry
on Eq., p. 337 ; side paging, § 10 ; V. C. Wigram, 3 Eng. Rail-
way Cases, 362 ; *North Union R. R. Co.* v. *Bolton and Preston
R. R. Co.*, ibid. 366.

4. The corporate character of the municipal body does not
place it beyond the reach of this remedial process, or enable it
to crush, at a blow, a railroad corporation chartered by the
state, unless it has a legal warrant for so doing. Story's Eq.
Jur., §§ 869, 870; and note 5 to latter section ; *Varick* v. *Mayor
of New York*, 4 Johns. Chy. 53 ; Story's Eq. Jur., § 955, *a ; Fre-
win* v. *Lewis*, 4 Mylne and Craig, 254.

II. The powers of the metropolitan police board do not affect the question. What the city council cannot lawfully sanction, that board cannot justify under an ordinance of the city council.

The corporation cannot rightfully employ the whole metro politan police force, arbitrarily, and with strong hand, to enforce its decrees.

1. This ordinance has nothing to do with the "*police or health*," within the meaning of section 5 of the metropolitan police act. Laws of 1857, Vol. II, p. 202; Bouvier's Dic. Police.

2. The license allowed by the common law, to arrest offenders without warrant, is designed for cases of sudden emergency. It never can justify calling out an army to stop the regular operations of a railroad corporation, without previous judgment or judicial process. 6 Carr. & Payne, 741 ; 2 Esp. N. P. 540.

3. Even if that remedy could be lawfully used against such an offender in any case, then, however lawful the ordinance of the common council may have been, the present case does not fall within its sphere of operations; for non-compliance with that ordinance is not an offense or misdemeanor. No penalty is attached to it. Laws of 1833, p. 13, §§ 20, 21 ; Laws of 1853, p. 446, § 5.

III. The railroad charter, section 1, expressly provides that the propelling power shall be such as "the company may choose to employ," and there is nothing in the charter to qualify this unrestricted grant of the sole and exclusive authority on this head. 4 Gill & John. 94.

The sixteenth section did not create a revocable power in the city corporation to permit the construction of the railroad, or to supervise the question of motive power. Its terms and the policy of the charter forbid such a construction.

1. The power there reserved to the city corporation is distinctly placed under three heads: First, as to the construction of the way or track ; second, as to the *time* and manner of using the track; third, as to the *speed* of carriages.

2. However comprehensive the word "manner" might be if it stood unaffected by terms limiting its application to the track,

it is here expressly so limited, and excluded from any reference to the carriages or their propulsion.

3. The motive power is placed under. the supervision of the directors by section one, and the "*speed*" alone subjected to the control of the city corporation.

4. After an investment of the whole capital by the subscribers, it would have been unjust, and, therefore, unwise, to place the whole enterprise under the absolute control of the city council, and in a perfect state of dependence on it. Consequently, no power of revoking the license to construct was given; nor would it be reasonable to construe the special and minor powers of regulation, which were granted, as authorizing a prohibition. Per Strong, J., *Milhau* v. *Sharp*, 15 Barb. 228.

IV. When the legislature distributes power over a subject among different classes of subordinates, they may not lawfully vary the distribution by contract among themselves. Consequently, any power to break up or prohibit the railroad, conferred upon the city corporation by the agreement of 1832, is void.

V. The proceedings which have been had, by mutual arrangement, between the city corporation and the railroad company, with the concurrence of the legislature, and the adjacent proprietors, amount to an agreement which equity will compel the parties to observe in good faith.

1. Corporate bodies may enter into engagements in like manner as individuals, so long as they act within the scope of their delegated powers. Formal instruments, under seal, are not necessary: Equity will enforce against them the principles founded on the doctrine of part performance. *Canal Company* v. *Railroad Company*, 4 Gill & Johns. 3, 5.

2. After the vast expenditures consequent upon the compliance of the railroad company, equity will not permit the city corporation, arbitrarily, to rescind the arrangement which has been made.

3. Strictly speaking, the railroad between Forty-second and Thirty-second streets is not built across or along any street or avenue of the city of New York. The whole legal notion of a

572    COURT OF COMMON PLEAS.

The New York and Harlem Railroad Co. v. The Mayor, &c., of New York.

street or highway, and all public rights of enjoyment or regulation concerning it, appertain to the surface. All rights and interests beneath the surface are special, and depend, as in other cases of proprietary interest, on the circumstances of the particular case. In this case, the railroad is placed, pursuant to contract, in a vault beneath the surface, and withdrawn from interference with the highway. The contract which they made with the city corporation is entitled to the same equitable protection that would be afforded to any of the thousands who own vaults constructed under public streets, in virtue of informal licences from the city authorities.

4. The original agreement between the city corporation and the railroad company, if valid, furnishes an additional ground of claim on the part of the railroad company to be left in undisturbed enjoyment of its *vault*.

VI. There is no foundation for the idea of nuisance, relinquishment of right, or contract to remove, set up by the defendants.

1. A slight amount of smoke at intervals, such as frequently disturbs the inhabitants of cities located near manufactories, does not constitute a nuisance. And where the persons complaining moved within the sphere of the alleged nuisance and planted themselves by its side, of their own choice, long after its erection, courts of equity will not listen to the suggestion of nuisance without a full trial and a finding of the fact.

2. The only person who pretends to have acted upon the ordinance of 1854 is Dr. Ten Eyck. He could not have been influenced by the panic of the company, and its attempted sale and removal in 1857.

3. There is no ground for denying the company its just rights, because of the temporary apprehension entertained by its officers, that the city corporation had absolute and irresponsible power.

*David Dudley Field and Greene C. Bronson*, for the defendants, the Board of Police Commissioners.

I. The Court of Common Pleas has no jurisdiction of this ac-

NEW YORK—JULY, 1858.                    573

The New York and Harlem Railroad Co. v. The Mayor, &c., of New York.

tion. The third subdivision of the thirty-third section of the Code, on which alone the plaintiffs must rely, does not authorize an action against a municipal corporation to restrain the execution of an ordinance.

II. This court has no jurisdiction to restrain the police commissioners. They are state officers, and compose a board of state officers. An injunction against such a board can be issued only by the Supreme Court at a general term. An injunction granted by the Supreme Court itself, at a special term, against state officers, has been lately disregarded, and the court appear to have acquiesced in the act. Acts of 1851, ch. 488.

III. If this court had jurisdiction of the action against the city, and could restrain the board of police, still it would not entertain this action, because, as a court of equity, it is not competent to control by injunction the execution of a municipal ordinance by public officers. If the officer act illegally, or enforce an illegal ordinance, he is responsible for the trespass; but it is not the province of a court of equity to restrain the commission of a trespass. 7 Johns. ch. 315.

IV. Should the court, however, determine to take cognizance of the case, and to hear the question upon its merits, the injunction should be refused, for the reasons which follow.

V. The authority of the city over the Fourth avenue, and the regulation of its use, has not been surrendered or taken away. The original charter of the Harlem Railroad Company (Laws of 1831, ch. 263, § 16) carefully guarded this right. The company acknowledged it when asking for permission to lay down their rails. The city granted permission, reserving the right to revoke it at pleasure. The company entered into a covenant to abide by this reservation. After this, to insist that the city has lost the reservation, is not only to reason loosely, but to act in bad faith.

The 16th section of the charter provided, first, that the company should not *construct* or *use* their railway in any of the streets or avenues, whether opened or unopened, without the consent of the city; and, as if to prevent such a consent being given as might restrict its subsequent control over the road, it

was further provided, that after the construction of the road, the city should have authority to *regulate the time and manner of using the same.*

Two guarantees of the city's rights were thus secured: first, the necessity of its previous consent, and, second, its continuing authority over the manner of using the railway. *Drake* v. *Hudson River R. R. Co.*, 7 Barb. 541, 548, 551, and *Milhau* v. *Sharp*, 15 ibid. 207.

We have the company here bound in three ways: first, by the reservation in the ordinance; second, by the covenant of the company; third, and best of all, by the explicit terms of the law which gave the company its existence.

It is, however, hinted, rather than plainly asserted, that the control, which in 1832 was thus reserved to the city, over the use which the public might make of the public avenues, has been somehow taken away, or lost by the subsequent legislation of the state, or the subsequent conduct of the city.

As to subsequent state legislation, there are two answers: first, that there has been none; and, second, that there could have been none. The subsequent grant to the Harlem company of the powers of the New York and Albany Railroad Company does not affect the question, because the New York and Albany railroad was to begin "on the island of New York, where the Fourth avenue terminates at the Harlem river." Laws of 1832, ch. 162, § 1.

The grant to the New Haven railway in 1848, of the right to run their cars and engines over the road of the Harlem company " as far into the said city as the said Harlem railroad may extend, upon such terms and to such point as has been, or may hereafter be agreed upon between the said companies " (Laws of 1848, ch. 143, § 6), did not exempt the Harlem Railroad Company from the control which the city then had over it. This section was intended to give to the New Haven railway rights against the Harlem railway, not to enlarge the powers of the latter. The language does not go beyond this intent. The New Haven company may go as far as the Harlem company. But

how far is that? Just so far as the common council permits, and no further. It extends to Forty-second street for one purpose; it extends to the Astor House for another.

If, however, the act of 1848 could be held, as it cannot, to have in terms released the Harlem company from municipal control, it would be for that very reason void. The rights of the city over the street, which it owns in fee, could not thus be taken away, nor could the obligation of the covenant made between the company and the city in 1832 be thus impaired: *Fletcher* v. *Peck*, 6 Cranch, 87 ; *Dartmouth College case*, 4 Wheat. 518.

If the legislature of the state, subsequent to 1831, has not taken away the control of the city over the Harlem railway, no more has the city itself surrendered its control. Indeed, it may here be said that the city could not have surrendered it. Its legislative power over the streets cannot be given up or impaired by any contract or act. There can be no estoppel against public officers. *Gray* v. *Mayor of Cambridge*, 4 Cranch ; *Coats* v. *Mayor*, 7 Cow. 585 ; *Britton's case*, Supreme Court, Mss. There is no occasion, however, to invoke this principle of law, for the city has done nothing that looks even like a surrender of its rights. What are the acts of surrender pretended? First, it is said that the ordinance compelling the company to arch over the tunnel was such an act; and, secondly, it is said, that the report of the committee of the common council, accepting the offer of the company to cut down the grade of the Fourth avenue, on the east side, between Thirty-second and Thirty-fourth streets, was another such act. It is perfectly clear, that in neither of these transactions was any such surrender *expressly* made. There is not a word about waiver, surrender, or loss of any of the rights or authority of the city. Is such a surrender, then, *implied?* That cannot be, unless it be clearly against good faith and fair dealing for the city, at any time after these acts, to insist upon the discontinuance of steam below Forty-second street.

VI. The ordinance of the city, which directed the company

HARVARD LAW SCHOOL LIBRARY.

576          COURT OF COMMON PLEAS.

The New York and Harlem Railroad Co. v. The Mayor, &c., of New York.

to discontinue the use of steam below Forty-second street, was a valid act of municipal legislation, regarding merely the authority of the city government over the streets, and the reservations contained in the act of the legislature, the ordinance of the city, and the covenant of the company. It was a valid act of municipal legislation for another reason. The use of steam engines in the tunnel, or across the sidewalk at Forty-second street, is a plain nuisance. The affidavits establish this fact. That is a nuisance which injures health, or is offensive to the senses, or renders the enjoyment of life and property uncomfortable. *Catlin* v. *Valentine*, 9 Paige, 675 ; *Fish* v. *Dodge*, 4 Den. 311 ; *Brady* v. *Woods*, 3 Barb. 159. One of the first duties of the common council is, to order a nuisance to be removed.

VII. The ordinance being valid, it was the duty of the Board of Police to enforce it. Act of April 15, 1857, chap. 569, §§ 5, 20. Suppose the company were to attempt to run its locomotive, with a train, through Broadway, or down Centre or Chatham streets, will any sane man suppose that the police are to abstain from interference ? If the ordinance in question be valid, and of that we suppose there can be no reasonable doubt, it is as illegal to run steam engines on the Fourth avenue, below Forty-second street, as it would be to run them in Broadway.

VIII. The whole history of the relations of the plaintiffs to the city shows a disregard of their obligations to it, and a contumacy towards its authority, which deserves the severest condemnation. When powerful corporations and persons of influence set the example, it is not surprising that disobedience to the laws should be so general.

IX. This is an attempt to prevent the execution of a municipal law, by a corporation which has defied it already for more than two years. An injunction ought never to be allowed, and cannot safely be issued to prevent the enforcement of law. The execution of the laws is already lax enough—too lax, indeed, for the good order of society—the good name of the country. It is to be hoped that no countenance will be given to this attempt to enlist the courts, not in the work of enforcing, but of obstructing them

*Richard Busteed and Gilbert Dean*, for the defendants, the Mayor, &c., of New York.

I. This case is a very simple one. The Harlem Railroad Company claims to have a vested right to run its locomotives, propelled by any power it sees fit to employ, over its railroad, located on the Fourth avenue in this city, down to its machine shops and depot at Thirty-second street. This right, if it exists in behalf of this artificial being, must be derived from some laws of the state or municipal grant.

II. If it exists, no matter in what manner obtained, or from what source derived, it must be set out in the complaint, on which *alone* the temporary injunction was issued, and which alone the plaintiff claims contains enough to warrant his prayer for an injunction restraining the municipal corporation of New York from enforcing an ordinance duly passed.

III. The passage of the resolution, forbidding the use of steam on the Fourth avenue below Forty-second street, is not in violation of any right or franchise of the New York or Harlem Railroad.

*a.* By the charter and laws, the absolute control of the streets within the city is vested in the Mayor, Aldermen and Commonalty, &c. As to the street or avenue in question, the fee in trust for the public is so vested.

*b.* The charter of the Harlem Railroad Company makes the right to occupy any of the streets or avenues, whether "such streets or avenues had been opened or not," to depend entirely on the "consent of the Mayor, Aldermen and Commonalty." And after the road has been constructed, the mayor, aldermen and commonalty are authorized, by the said charter, "to regulate *the time and manner* of using the same." By this, full power to say whether "the same," that is, the road, shall be used in the night time or the day time, and "the manner," that is, the kind of power, and the description of cars, that shall be used, is reserved to the city.

*c.* The corporation of the city, and the railroad company, have so construed this charter; and never until now has any

such claim been set up. Contemporaneous construction should prevail, even if it were doubtful what would be the real one.

*d.* Not only have the corporation the right thus to control the action of the Harlem Railroad Company, when using its streets, but it has never pretended or professed to surrender it, and it would be a breach of duty in the municipal government to surrender this right. Opinion of Comstock, J., in *Davis* v. *The Mayor, &c., of N. Y.,* 4 Kernan, 506. The fact that the road runs *under* the avenue does not affect the question.

*e.* The right to regulate the time and manner of using the streets of a crowded city is necessarily exclusive and sovereign, and must be reposed in the local government.

*f.* The charter of plaintiffs was accepted with a full knowledge of the law, and on the condition that it should he held subject to the will of the local government, and thus became and was a part of that charter, even if it had not been in terms incorporated in it.

*g.* The rights of the company depend wholly on its charter. If the legislature have authorized it, locomotives may, without the assent of the municipal government, run from the City Hall to the Battery, provided the right of way has been acquired; and the converse of the proposition is equally true.

The amendment of 1848 does not confer any rights on the Harlem road, as to their engines.

IV. The common council had full authority to adopt the resolution; and being the exercise of its legislative authority, the reason of that exercise cannot be inquired into here. 1. The municipal government of the city is not here to justify the expediency of the passage of the resolution or ordinance in question. *It willed it, and therefore it did it.* Not even in a court of justice can the motives which prompted a legislative act be questioned. *Milhau* v. *Sharp,* 15 Barb. Sup. Ct. R. 193.

"So far as the common council acts in the exercise of its public political powers, and within the limits of its charter, it is vested with the largest discretion; and whether its laws are wise or unwise, whether they are passed from good or bad motives,

it is not the province of a court to inquire." 18 Wendell, 99 ; 17 How. 29, 30. 2. No court, in justifying an order restraining the common council, has ever claimed the right to supervise, inquire into, or review the legislative acts of the board. The reason or excuse has been found in some alleged excess of juris- diction, violation of a trust, in regard to private property or right, or on some ground other than an interference with the legislative powers of the board. 3. The celebrated contempt case of the *People* v. *Sturtevant* is no exception to the rule stated. The Court of Appeals, in 5 Selden, 271, put the decision on the ground that the act was not one of municipal legislation, but a grant upon condition. 4. The corporation has the exclusive right to control or regulate the use of the streets in the city, and in this respect is endowed with legislative sovereignty. 17 Barb. 438; *Davis* v. *The Mayor, supra.* 5. This power, being a dele- gated one, cannot, by the corporation, without the assent of the state legislature, be delegated. *Barto* v. *Himrod*, 4 Selden, 483 ; 17 Barb. 438. 6. The whole subject of the regulation of the streets, carriage way, and sidewalks, and the manner in which they shall be used, is in the corporation, and must remain subject to its control. 7. It follows that, no matter what ar- rangement the corporation has made with the railroad com- pany, as to the use of a street, it is either revocable or it is void.

V. The resolution or ordinance complained of is not in viola- tion of any contract, agreement, or understanding between the plaintiffs and the common council. 1. The grant made to the railroad company was conditional, and the contract renewed the power of regulation and revocation. 2. The other arrange- ments, agreements, and inducements are not in the complaint set out as in writing, and are too vague, indefinite, and uncertain, to found any right of action on. But, besides this, they are all denied. 3. The plaintiffs have no cause of complaint, when the franchises they enjoy are taken into account.

VI. An injunction is not the remedy, even if the action of the board in passing the resolution or ordinance was unwise, impoli-

580 COURT OF COMMON PLEAS.

The New York and Harlem Railroad Co. v. The Mayor, &c., of New York.

tic, or oppressive. An application for a repeal or modification should be made.

HILTON, J.—The plaintiffs are a railroad company, incorporated by an act of the legislature, passed April 25th, 1831 (Laws 1831, p. 323), with power to construct a railroad, or way, from Twenty-third street to the Harlem river, and "to transport, take, and carry property and persons upon the same, by the power and force of steam, of animals, or any mechanical or other power, or of any combination of them, which the said company may choose to employ." The act contains eighteen sections, most of which are devoted to the manner in which the capital stock shall be subscribed, and the right of way acquired upon the route, to be fixed upon by the company, subject to the approval of the common council of the city of New York. After provision is made respecting these subjects, section sixteen further provides, that "nothing in this act shall be deemed to authorize the said corporation to construct or use their railroad, or way, across or along any of the streets or avenues, as designated on the map of the city of New York, whether such streets or avenues shall have been opened or not, without the consent of the mayor, aldermen, and commonalty of said city, who are hereby authorized to grant permission to the said corporation to construct their said railroad, or way, across or along said streets or avenues, or prohibit them from constructing the same; and, after the same shall be constructed, to regulate the time and manner of using the same, and the speed with which carriages shall be permitted to move on the same, or any part thereof," &c.

On December 22d, 1831, the mayor, aldermen, and commonalty of the city of New York, upon the application of the plaintiffs, adopted an ordinance permitting a railway, or track, to be laid down pursuant to this act, and in conformity with a map on file in the register's office. Section two of the ordinance is to the effect, that if, at any time after the construction of the railway, it shall appear to the mayor, aldermen, and commonalty of the city of New York, that the railways, or any part

thereof, constitute an obstruction or impediment to the future regulation of the city, or the ordinary uses of any street or avenue (of which the mayor, aldermen, and commonalty should be the sole judges), the plaintiffs, or the directors thereof, shall, on the requisition of the said mayor, aldermen, and commonalty, forthwith provide a remedy for the same, satisfactory to the mayor, aldermen, and commonalty ; or if they fail to find such remedy, they shall, within one month after such requisition, proceed to remove such railway, or other obstruction or impediment, and to replace the street or avenue in as good condition as it was before the railway was laid down, &c. By section three, the right of regulating the description of power to be used in propelling carriages on and along the railways, and the speed of the same, as well as all other power, reserved to the said mayor, aldermen, and commonalty, by the act of incorporation of the plaintiffs, was expressly retained and reserved. By section eight it was declared, that the ordinance should not be considered as binding on the common council, nor should it go into effect until the plaintiffs first duly execute, under their corporate seal, an instrument in writing, promising, covenanting, and engaging, on their part and behalf, to stand to, abide by, and perform all the conditions and requirements of the ordinance, such as the mayor and counsel to the board should approve; and, when so signed and approved, to be filed with the comptroller.

On January 9th, 1832, the plaintiffs accordingly executed, under their corporate seal, and filed with the comptroller, an agreement reciting the ordinance, and in consideration thereof, and pursuant to its requirements, covenanted, engaged, and promised, on their part, to stand to, abide by, and perform all the conditions and requirements contained in it. After having thus obtained the consent of the corporation of the city, the plaintiffs proceeded to, and did acquire, under their act of incorporation, the title to a strip of land twenty-four feet in width in the Fourth avenue, extending from Twenty-third street to the Harlem river, and upon which their track is now laid.

Subsequently, and in 1848, the avenue was opened as a public

street, in the manner prescribed by law, and by which it appears the plaintiffs' title, thus acquired, was extinguished.

In December, 1844, and while the engine-house and steam-depot of the plaintiffs was located on the avenue at Twenty-sixth street, the mayor, aldermen, and commonalty adopted a resolution or ordinance requiring the discontinuance of steam power below Thirty-second street, prior to August 1, 1845. This direction was not complied with until the fall of 1846, when the plaintiffs removed their engine-house, machine-shop, &c., to Thirty-second street, upon the alleged suggestion and assurance of the corporation of the city that the location at Thirty second street would be permanent, and not subject to further interference.     Under these suggestions and assurances, it is alleged that the plaintiffs have constructed improvements at the location named, at an expenditure of upwards of $94,000.

On August 8, 1850, the mayor, aldermen, and commonalty adopted a resolution requiring the plaintiffs to construct an arch over that part of their road which was laid in the trench cut through the avenue at Murray hill, and extending from Thirty-second to Forty-second streets.    The plaintiffs were induced, as they allege, to acquiesce in this measure, and make the expenditure requisite to construct the arch, under assurances made before the committee of the common council, that such improvement would obviate all objections to the permanent erection of the depot at Thirty-second street.

After the arch had been completed in accordance with the resolution, and on December 27, 1854, the mayor, aldermen, and commonalty adopted a resolution or ordinance in the following words: " *Resolved*, That no locomotive or steam engine be allowed to run on the tracks of the Harlem and New Haven railroad company on Fourth avenue, south of Forty-second street, eighteen months after the passage of this ordinance."    The plaintiffs neglected to conform to this requirement, and the Board of Commissioners of the Metropolitan Police district made an order directing their superintendent to enforce it.    The plaintiffs rest their refusal to obey it on the ground that the ordinance was

passed in violation of their rights and franchises, as granted by acts of the legislature; claiming that it is without any legal or equitable authority to authorize its passage; and also that it is in violation of the aforesaid agreement.

Upon a complaint embodying substantially the facts stated, and alleging that the enforcement of the ordinance of December, 1854, would be ruinous to the business of the plaintiffs, this court is asked to restrain the defendants from interfering with the running of the steam engines of the plaintiffs, or of the New York and New Haven Railroad Company, upon the Fourth avenue to Thirty-second street.

In opposition to this application, the defendants have furnished affidavits showing that Murray hill, and the lands adjacent to the plaintiffs' engine depot at Thirty-second street, has become a thickly settled part of the city, and is used as a place of residence by citizens who have erected there valuable and expensive buildings; that the plaintiffs have placed their rails on the sidewalk and carriage-way of the avenue at Thirty-second street, and use them with their cars and engines in such a manner as to render that part of the avenue highly dangerous to travellers on foot, or in their own vehicles, and that the smoke, gas, and noise resulting from the running of locomotive engines on the avenue below Forty-second street, creates a nuisance noxious and offensive to the neighboring inhabitants, and materially interfering with the proper enjoyment by them of their property.

Upon the argument, the counsel for the police commissioners presented two preliminary objections, which seem entitled to attention.

*First.* That this court has no jurisdiction of an action of this nature against the corporation of the city.

The jurisdiction of this court is partially defined by section thirty-three of the Code of Procedure. It extends to actions which relate to the determination in any form of a right or interest in, and for injuries to, real property; to actions of partition and foreclosure; to certain actions for the recovery of a penalty or forfeiture imposed by statute; and to actions against public

584 COURT OF COMMON PLEAS.

The New York and Harlem Railroad Co. v. The Mayor, &c., of New York.

officers in certain cases; also to all other actions where the defendants reside, or are personally served with summons, in the city; or where one or more of several defendants, jointly liable on contract, reside or are personally served with summons within the city; *and also* to actions against corporations, created by or under the laws of this state, and transacting their general business, or keeping an office for the transaction of business, *within the city, or established by law therein;* or created by the laws of any other government, for the recovery of any debt or damages, whether liquidated or not, arising upon contract made, executed, or delivered within this state, *or upon any cause of action arising therein.* Code, §§ 33, 123, 124; Laws of 1847, p. 279, § 7; ibid. 1854, p. 464. The constitution (Art. 8, § 3) also provides, that "all corporations shall have the right to sue, and shall be subject to be sued, in all courts in like cases as natural persons."

These provisions of law would seem decisive upon the question; and the decision of the Court of Appeals, in *The People ex rel. Davis & Palmer* v. *Sturtevant* (5 Seld. 263), so fully sustains the jurisdiction, that the point here taken can scarcely be considered open for discussion. And it is proper to add, that the counsel for the corporation not only declined to present it, but expressly disclaimed it.

*Second.* It is objected that this court has no jurisdiction to re strain the police commissioners; that they are state officers, and comprise a board of state officers, and, against such, an injunction can only be granted by the Supreme Court at a general term.

In support of this view I am referred to chap. 488, Laws of 1851, p. 920. But upon reference to section two of that act, it will be seen that the words "state officers," in the sense there used, were only intended to include such as had been theretofore so denominated; and to designate those who were immediately connected with the government of the state, and in actions against whom it was the duty of the attorney-general to appear for and defend. Const. 1846, Art. 5, see marginal note to § 1; *Christman* v. *Floyd*, 9 Wend. 342. The police commissioners are mere local,

district officers, and are not state officers, within the proper meaning of the term, as used in the act of 1851; consequently, in a proper case, they can be restrained by this court in the exercise of its equity powers, in the same manner, and to the like extent, as other local or county officers.

These objections having been disposed of, I proceed to the examination of the principal question:—Whether the ordinance intended to be enforced was passed in violation of previous agreements between the corporation of the city and the plaintiffs, or of the rights or franchises granted to the plaintiffs by the legislature; or without any legal authority.

The legislative power and control of the corporation of the city, over the streets and avenues within its limits, are very extensive, and the only limitation upon them is, that they shall be appropriated to no use or purpose which is not alike free and common to all citizens and travellers. Everything which tends to render the streets useful or convenient, for the purposes of travelling upon them as common public highways, is within the power of, and may be exercised by the corporation. But as converting them to railroad purposes, and permitting rail tracks to be laid upon them, to be used by an individual or an association, in the transportation of merchandise and passengers for hire, is a devotion of them to a use exclusive in its nature, and which, from its very character, cannot be alike common to all travellers; hence the legislature, in the act incorporating the plaintiffs, gave to the corporation of the city *express authority* to grant permission to the plaintiffs to construct their road across or upon the streets over which their route might be laid. *Davis* v. *The Mayor of N. Y.*, 4 Kernan, 506, 515, 517, 522, 524; *Milhau* v. *Sharp*, 17 Barb. 437; *Williams* v. *Central R. R.*, 16 N. Y. Rep. 97; *Attorney-General* v. *The Mayor of N. Y.*, 3 Duer, 119–153. Although the power to give this permission must be derived from the legislature, yet its exercise does not in any way deprive the corporation of its legislative control over the streets in all other respects, and it is entirely competent to impose, upon the parties asking permission, such restrictions as the corporation may think proper

in regard to the manner in which the rail track shall be used, and also such conditions as upon which the right to continue in the future use of the same may depend.

But apart from the restrictions imposed by the sixteenth section of the act incorporating the plaintiffs, 'and the rights expressly reserved to the corporation by the contract entered into by the plaintiffs on December 22d, 1851, upon obtaining permission to lay their track, the corporation might at any time regulate the manner of using, and the motive power to be used upon the track, whenever in its opinion the public interests required such interference or regulation.

This regulating or legislative power of the corporation over the streets partakes of the character of legislative sovereignty, originally conferred by the charter of Governor Dongan in 1686, confirmed in 1730 by the Montgomerie charter, and subsequently by legislative grants; it may well be doubted whether the city can be wholly deprived of it even by an act of the legislature itself. Certain it is, however, that the corporation cannot surrender any part of it into the hands of private individuals, or of a private corporation, without previous legislative sanction, and any attempt by it to do so, without such authority, would be utterly void.    See cases cited *supra*.

In the present case, not only did the legislature abstain from authorizing the corporation to grant the plaintiffs any permission except to construct their railroad across or along certain streets and avenues of the city, but, in addition, recognized this regulating and legislative power of the corporation over its streets, by providing that, after the road should be constructed under such permission, the *time* and *manner* of using the same, and the speed with which carriages should be permitted to move on the same or *any part thereof*, should be subject to it.    The plaintiffs accepted their charter with this restriction; upon obtaining permission to lay their rails they recognized it as such; and by their agreement of January 9th, 1832, bound themselves to conform to it, and all the other conditions required by them, by the ordinance of December 22d, 1831.

But it is contended that this agreement is not binding upon the plaintiffs, because it attempted to transfer to the corporation the discretion vested in the plaintiffs, by their act of incorporation, and by which it is said that *they alone* possess the right to determine the motive power to be used on their road.

The answer to this is twofold:—1st. A party, applying to a court for the application of its equitable powers, should be held to the rule, "that he who seeks equity must do equity." He should not be permitted to found his claim for relief upon a permission contained in a contract, while he repudiates the conditions and covenants entered into by him, and which formed the consideration upon which the permission was granted. *Linden* v. *Hepburn*, 3 Sand. S. C. R. 371; Willard Eq. Juris. 346.

2d. The agreement, for the reasons I have stated, was not a transfer of the corporate power of the plaintiffs. The corporation might grant or withhold its permission, and, if granted, it had the right to impose upon it such restrictions and conditions as would enable the mayor, aldermen, and commonalty to so regulate the use of the plaintiffs' road as to prevent it being an inconvenience to citizens and travellers. Besides, as before stated, the plaintiffs accepted their charter with this restriction upon their corporate power, and cannot now be permitted to complain that it turns out to be more burdensome or inconvenient than was at first anticipated.

Again : It is contended, that even admitting that the corporation originally had the power, under the act incorporating the plaintiffs, and the ordinance contained in the agreement of January 9, 1832, yet by subsequent assurances to, and agreements with the plaintiffs, and upon the faith of which the plaintiffs had incurred large expenditures, and submitted to great inconveniences, it has deprived itself of the right to interfere in any way with the plaintiffs in their present use of their road.

The answer to this is likewise twofold:—1st. There can now exist no doubt that corporations, like individuals, may be bound by implied contracts, to be deduced by inference from corporate acts, without either a vote, writing, or deed. *Ex parte Peru Iron*

*Co.,* 7 Cowen, 540; *American Ins. Co.* v. *Oakley,* 9 Paige, 496; *Peterson* v. *The Mayor of New York,* 17 N. Y. Rep. 449.   But in applying this rule we must be careful not to violate other legal principles, such as, that no act can be made valid which is without the power of the corporation, or the scope of its authority. Here, as we have seen, the corporation could not deprive itself of its legislative power over the streets, and prevent its hereafter regulating their use by all persons, including the plaintiffs; and any attempt to do so by contract, either express or implied, would not only be revocable at pleasure, but void.

2d.  The papers read on this motion failed to convince me that the corporation ever entered into any such agreements as the plaintiffs claim; or that their acts were such as would lead me to infer any contract of the nature alleged.   It is quite probable the plaintiffs supposed, when they arched over the trench from Thirty-third street to Forty-second street, that they had put an end to all further interference with them in the use of their steam engines above Thirty-second street; but if this act was based entirely upon such a supposition, the court cannot give any relief founded upon it, though it may have been entertained and acted upon in good faith.

Having, for the reasons stated, arrived at the conclusion that the ordinance, which the plaintiffs ask to have the enforcement of restrained, is valid, and one that the plaintiffs are bound to obey, it does not seem necessary to inquire into the reasons which actuated the mayor, aldermen, and commonalty of the city of New York in adopting it, nor would such an inquiry be proper, because courts are bound to assume that, where a discretion is vested in a municipal body, exercising functions of a legislative character, good reasons existed for the adoption of a regulation or ordinance which was the result of such a discretion. *Oneida Com. Pleas* v. *People,* 19 Wend. 79, 99   But, were it otherwise, it would be sufficient to say that the affidavits presented by the defendants go far to show that the use of steam engines at the plaintiffs' depot at Thirty-second street constitutes a nuisance to the neighborhood, and the constant running of

engines across the sidewalks, and the condition of the avenue at this point, produced by the plaintiffs' acts, constitute an obstruction to its free use by our citizens to such an extent as to call for the adoption of the ordinance in question, and its enforcement by the police commissioners. These may have been the reasons which controlled the defendants in their conduct; but whether they were or were not, as I before remarked, it is not my duty to consider, having determined the ordinance in question to be within the power of the corporation to adopt, and one that the police may properly enforce.

Although upon the argument it was deemed, by counsel on both sides, necessary to inquire into the powers and duties of the board of police commissioners, and the powers of a policeman or constable, both at common law and under the broad provisions of the metropolitan police act (2 Laws 1857, p. 200), it seems unnecessary that I should follow them, after having arrived at the conclusion stated. It is enough to state that the duty of enforcing all the public ordinances of the city, and especially those which are applicable to *police or health* (§§ 5, 20), is imposed by law upon the board of police commissioners, and to add that, upon the affidavits read on this motion, the ordinance in question might very properly be classed under either head.

I have abstained from inquiring whether, under the law amendatory of the act incorporating the plaintiffs, passed March 29, 1848 (see Laws of 1848, ch. 143, p. 238), the New York and New Haven Railroad Company acquired any greater rights in respect to the use of the plaintiffs' track than is possessed by the plaintiffs, because that company is not before the court as a party to this action. But if the views I have here stated are correct, it is difficult to perceive wherein their position, under the ordinance in question, differs materially from that of the plaintiffs.

The motion for injunction is denied.(*a*)

---

(*a*) Subsequently the New York and New Haven Railroad Company, upon a bill filed in the United States Circuit Court against the same defendants, applied for an injunction like the one asked for in this case. Upon the motion, substantially the

same facts were presented. After hearing the parties, Judge Nelson, in August, 1858, denied the application.