## SUPREME COURT.

Thomas J. Hall, surviving partner of William Hall, deceased, agt. Oliver Ditson and others.

*Chattel mortgage — Usury — Sale under the mortgage — purchase by mortgagee — effect of sale — action to redeem — claims of co-defendants.*

Upon the loan of money to be secured by a chattel mortgage on copyrights, music plates, &c., &c., a printing contract between the parties being made at the same time, by which it was agreed that the mortgagees might print music from the plates of the mortgagor, the expense of printing and materials to be borne by the mortgagees, the profits from the music so printed to be divided equally between the parties, it appearing that the loan of the money and the printing contract were part and parcel of one general arrangement in the beginning, but were in fact made afterwards divisible, and after the mortgage was executed, and before the printing contract was made, the option was given to the mortgagors to give up the printing agreement, but they desired it to be made.

*Held*, that the transaction was not usurious.

*Clark* agt. *Sheehan* (47 *N. Y.*, 188) applied.

Where a mortgagee of chattels upon a public sale makes reasonable and fair efforts to sell the property for a good price, and through the acts, statements and notices of the mortgagor at the time of sale, the effect of which is to discourage bidding, and the same does not bring a full price, a court of equity will not set aside the sale on the application of the mortgagor.

The effect of a public sale, upon due notice, under a chattel mortgage is to cut off the equity of redemption of a mortgagor.

A mortgagee, under a chattel mortgage, may himself become a purchaser on a public sale of the chattels.

In order to redeem under a chattel mortgage the mortgagor must in good faith pay or tender the whole mortgage debt, and *that before suit brought.*

Where the plaintiff upon a trial is not found to have just ground for equitable relief, the action cannot be held to adjust rights and claims

between co-defendants, not related to the cause of action set up in the complaint.

*Special Term, March, 1878.*

THIS action is brought by the survivor of two mortgagors in a chattel mortgage to set aside a sale made under the mortgage and for a resale. The plaintiff also asked for an accounting by the mortgagees, and that upon the payment of the amount found to be due on the mortgage the plaintiff be restored to his rights to the mortgaged property. The plaintiff also claimed that an agreement, made contemporaneous with the mortgage, for the division of profits arising under a printing contract was a clog upon the mortgage and should be adjudged invalid, and that the mortgagees account for all the profits. The personal representatives of a deceased co-mortgagor were parties defendants as well as other persons who claim an interest in the mortgaged property. The personal representatives of the deceased mortgagor set up the defense of usury in the mortgage, and the other defendants interposed claims in opposition to the mortgagees.

*Sullivan, Kobbe & Fowler*, for plaintiff.

*Estes & Barnard* and *Erastus Cook*, for defendants Ditson & Co.

*Charles W. Sandford*, for executors, &c., of William Hall.

*Edward Patterson*, for James F. Hall.

VAN VORST, *J.* — The plaintiff claims that the printing contract, bearing even date with the chattel mortgage executed by Hall & Son to the defendants Ditson & Co., was a hard and unconscionable agreement and a clog upon the mortgage. He does not, however, urge that the transaction was usurious. The executors of the last will of William Hall,

Hall agt. Ditson.

deceased, who are made defendants, by their answer, interpose a claim that the mortgage was usurious in its inception, the usury growing out of the advantage gained by the mortgagees through the printing contract, which, it is claimed, was part and parcel of the transaction through which the moneys were loaned, for the security of which the chattel mortgage was in part made, and that the printing · contract was exacted by the mortgagees and yielded by the mortgagors, and that the transaction, in its inception, was designed to secure to the mortgagees an advantage, in the way of gain, over and above the legal interest they would realize on the loan and forbearance of the money advanced and secured by the mortgage. These defendants also claim that the vice of usury enters into the Pond mortgage, which was assigned to Ditson & Co. at the time the mortgage and printing contract above-mentioned were made and delivered.

The plaintiff claims that the agreement should be set aside as unconscionable. The executors claim that the mortgages are void for usury.

Equity will not, as is urged by the learned counsel for the plaintiff, allow a mortgagee to clog the equity of redemption with any by-agreement, and will not uphold any oppressive arrangement or advantage exacted by the mortgagee at the time of the loan of money. But a careful consideration of the evidence fails to discover any thing in the circumstances under which the printing contract was executed, hard or unconscionable on the part of Ditson & Co., or any thing, in a true sense, unfair or inequitable in the arrangement, even though it be considered as standing by itself, apart from the mortgage. It was not so regarded at the time, nor has subsequent events demonstrated it to be such.

Carried out according to its true intent, the printing contract secured rights and interests of mutual advantage.

A similar agreement had been made by Hall & Son with William A. Pond, in December, 1871, on an occasion when they borrowed money from him. No complaint appears to

have been made at any time that such agreement was hard or unfair in its terms or operation, or that Pond had secured thereby any unfair advantage or disproportionate gain.

The fact that Hall & Son were willing, under the circumstances disclosed by the evidence, freely and of their own accord to enter into a similar arrangement with Ditson & Co., would indicate that the arrangements were by them regarded as favorable to their interests.

The evidence does, indeed, justify the conclusion that the agreement for the loan of money by Ditson & Co., and the postponement of the payment of their existing claim against Hall & Son, the payment of which was to be secured by a chattel mortgage on the music plates and copyrights, was made at the same time when the terms of the printing contract were agreed upon.

In one sense they were truly part and parcel of one general arrangement, and were, in the end, formally put in shape on the same occasion at the office of Messrs. Estee & Barnard. Yet under the evidence I cannot say that they were absolutely and unqualifiedly dependent, the one on the other.

It may well be that the fact that the printing contract was also tendered and to be executed was a controlling reason inducing Ditson & Co. to agree to make the loan and postpone payment, and to take up the Pond and Morrison mortgages. But in the end, after the Pond and Morrison mortgages had been assigned and the money paid therefor, and the mortgage to Ditson & Co. had been executed by Hall & Son, the option was distinctly and unqualifiedly left with them as to whether they would execute the printing contract, and they, without hesitation, concluded to do so.

It is suggested by plaintiff's counsel that the offer to abandon the printing contract at this time made by Ditson & Co. was neither sincere nor honest.

I do not know that we are fully justified in detracting from the offer made by Ditson & Co. the elements of sincerity and honesty.

Hall agt. Ditson.

In making the offer Ditson & Co. may have supposed that Hall & Son would not withdraw but that they would be still willing, and perhaps claim, that the printing contract should be made, and that they should assume the responsibility of making advances under it. I think that the speech and acts of parties are entitled to be considered as springing from good and honest motives, where the facts and circumstances do not establish the contrary and that parties mean what they say. But the fact that Ditson & Co. then expressed a willingness to give up the printing contract is distinctly proven and strips the transaction of that hardness and severity which is sought to be impressed on it, if there be in fact any thing inequitable in its terms. There was a " *locus penitentiæ* " for Hall & Son, and the option was tendered them of withdrawing from that part of the arrangement.

That they then expressed a *desire* for the contract is well established by the evidence, and they freely made it.

There is a fair inference to be drawn from the evidence that it was for the real advantage of Hall & Son that the printing contract with Ditson & Co. should be made. Hall & Son were in straitened circumstances; they had not the means at hand to carry on the work of printing promptly. They were then largely in arrears to the printer for work theretofore done, and encountered difficulty in discharging the obligation, and further work was to be paid for as the work was done.

Under the printing contract Hall & Son were entitled to receive one-half of the profits of all music which Ditson & Co. should print from the plates, over and above the costs and expenses of printing and materials furnished.

While I can see that such arrangement would be of advantage to Hall & Son, I am not prepared to say that one-half the profits would be an undue proportion of advantage to be realized by Ditson & Co. for their advances, care and risk in carrying out the arrangement. Hall & Son reserved to themselves the right to print for their own business from the plates.

The arrangement was well and clearly understood, and was, without doubt, deemed to be of mutual advantage. And, when the contract was executed, Hall & Son expressed the hope that Ditson & Co. would produce and sell more music than Pond had done under his contract.

I cannot, therefore, conclude that there was any thing in the circumstances under which this contract was made, or in the contract itself, which entitles the plaintiff to any relief against it for the reasons assigned by him. . It was voluntarily and understandingly entered into by them, after an experience under a similar contract made some years before with Pond, through which they had a proper comprehension of the advantages and operation of such an arrangement. There is no satisfactory evidence that it was forced upon or exacted from them. They were under no compulsion ; and I fail, even now, to see why the arrangement was not of advantage to them.

I do not think that the transaction is obnoxious to the vice of usury, as is urged by the executors of William Hall, deceased. The scheme, in my opinion, from the evidence, was not resorted to by Ditson & Co. to realize more than legal interest on the loan and forbearance of money.

Although the two transactions, the loan and forbearance of money and the printing contract, were originally contemplated by the parties as parts of one general arrangement, yet they were in themselves divisible.

The loan and forbearance of the money and the printing contract are represented by separate instruments.

The mortgage secured to Ditson & Co. legal interest on the moneys secured thereby. The printing contract provided for a distribution of profits to be realized on the music printed by Ditson & Co. on the plates of Hall & Son. The material and necessary funds were to be supplied by Ditson & Co.

It was not stipulated by Hall & Son that there would be any profits. It was not an assured matter that there would be any gains. There might and might not be profits. The result

was speculative, dependent upon the cost of production and the result of sales.

Ditson & Co., who made the advances, assumed the risk of there being sufficient sales in the end, at remunerative prices, to justify the printing.

Conceding that Ditson & Co. originally made the loan and forbearance of money dependent upon the making of the printing contract, still I do not think that such arrangement would be necessarily usurious.

The printing contract was a business operation and by its terms is not shown, in itself, to be unfavorable to Hall & Co.

The market was not at the time well supplied with their music, and it was essential to Hall & Son that it should be to maintain the value of their copyrights and plates.

Hall & Son were unable to conduct the business profitably. Ditson & Co. were responsible parties.

The printing contract might well stand on its own merits as a good and satisfactory arrangement, separate and apart from the loan of money, and as truly beneficial to Hall & Son.

This case is, in many respects, analogous to *Clark* agt. *Sheehan* (47 *N. Y.*, 188), and upon the principles therein assumed the transaction is not usurious, and the same result applies to the Pond mortgage of which they took an assignment. In disposing of the claims of the plaintiff and the executors of William Hall & Son, above discussed, I cannot resist the conclusion that the interposition of Ditson & Co., at the solicitation of William Hall, was, under the evidence, timely and advantageous to Hall & Son.

They advanced the moneys, $10,000, to relieve Hall & Son from the Pond mortgage, which was due and its payment urged. They advanced the moneys to satisfy the holder of the Morrison mortgage, and extended the payment of their own debt and made an additional loan of $4,000.

They also took a printing contract for two years, by the terms of which Hall & Son, besides reserving to themselves the right to print from the plates for their own trade, were

entitled to receive one-half the profits on what Ditson & Co. might print. The arrangement, as a whole and in parts, is not open to the objections urged.

I see no hardship or practical injustice in allowing to go in the transactions to be adjusted under the printing contract an item of an account in favor of Hall & Son against Ditson & Co. for music recently ordered, the gross amount of which was only then known; the amount of the printing, paper and royalty had not yet been adjusted and could not then be deducted. From its proximity, in point of time to the making of the printing contract and the character of the transaction, it was not remarkable that it should be allowed to be embraced in a settlement thereunder.

Although the terms of the printing contract did not embrace this item, yet it was competent for the parties to agree that it should be subject to its terms. They so agreed.

I have carefully considered the evidence relating to the sale of the property under the mortgages and cannot agree with the plaintiff's counsel that the same was unfairly made, or that it should be set aside by occasion of any act or omission of Ditson & Co.

I am, on the other hand, of the opinion from the evidence that the mortgagees made reasonable efforts to secure a favorable sale of the property after all attempts to adjust the matters with the plaintiff had failed.

I think that the statements made by the auctioneer and the defendant Haynes, described the property covered by the mortgages with sufficient certainty at the time of the sale.

The statement as to the number of plates was an estimate. It was not otherwise represented. But the announcement was that the entire catalogue would be sold. There were some missing plates, but Haynes stated they were useless, and it is not shown that his statements were untrue. These missing plates it was understood were not sold. Hall & Son's catalogue, which was announced to be, and which was in fact,

sold, minus the missing plates, was well known to the music trade and by the persons attending the sale.

I do not see that any information desirable to secure a favorable sale was witheld.

It was stated by Haynes, on the sale, that the plates aggregated about 15,000, there might be one or two thousand more or less. The valuable plates and compositions were, however, within a small compass. It turns out that there were over 20,000 plates, in all, covered by the mortgage. Haynes had not counted the plates, and did not know the actual number. But the more important statement was, however, made that the whole of the catalogue would be sold, except four or five hundred pieces which could not be found, and some plates destroyed by the Boston fire. And, in respect to these, it was said that they were of little value. The number of subjects was, however, given. The plaintiff was present at the sale ; he made no correction of the statement of defendant Haynes.

It cannot be said that the persons present at the sale, and who well knew the catalogue, were not sufficiently advised of what was to be sold. I think they understood the subject and what was to be sold. The weight of evidence is that they were so advised.

The efforts made by Ditson & Co. to secure the attendance at the sale of the members of the Board of Music Trade in the United States, then in session in New York, certainly was evidence of a desire on their part to secure a good sale of the property. It was evidence of an honest intention. But as much cannot be said in favor of the plaintiff and the personal representatives of William Hall, deceased. Their efforts were evidently intended to depress and defeat the sale. The statements made by them, and the claims interposed through them, had the effect to discourage bidding on the property; and if through their efforts the property did not bring a full price, I cannot see how a court of equity should interpose to aid them in setting aside the sale upon the ground that the property sold for less than its value. Through

the character of the parties and claims interposed no other result could have been anticipated.

The plaintiff put forward a claim of his wife to a portion of the property. The defendant James F. Hall, a brother of plaintiff, interposed a claim of one-half interest in a large share of the copyrights. The executors of William Hall, deceased, objected to the sale for the reason that they had no notice thereof, and claimed it to be invalid. And one of the attorneys for the plaintiff, who appeared for some other interest, also represented that William M. Tweed had a mortgage of $6,000, and interest, since 1870, upon the property, which could be enforced against any one who should purchase.

If the claims thus made were interposed in good faith, the property, I am satisfied, sold for more than it was really worth, subject to those claims. If the claims were not *bona fide*, it was wrong to interpose them.

The effect of the public sale under the chattel mortgages was to extinguish the outstanding equity of redemption (*Chamberlain* agt. *Martin*, 43 *Barb.*, 607; *Ballow* agt. *Cunningham*, 60 *id.*, 425; *Huggins* agt. *Fryer*, 1 *Lans.*, 276; *Hulsen* agt. *Walter*, 34 *How. Pr.*, 385).

The right of the mortgagee to purchase at the sale is recognized in *Olcott* agt. *Tioga Railroad Company* (20 *N. Y.*, 546). *Pulver* agt. *Richardson* (3 *S. C. R.* [*T. & C.*, 436]) appears to be the other way, and holds that a purchase by the mortgagee does not bar the mortgagor's equity of redemption. But that case rests upon *Buffalo Steam Engine Works* agt. *Sun Mutual Insurance Company* (17 *N. Y.*, 403). This latter case, however, as is said by Selden, J., in *Olcott* agt. *Tioga Railroad Company* (*supra*), was disposed of on other grounds. The reasons why a mortgagee should be allowed to purchase at such sale are well stated by Selden, J. (*See, also, same case*, 40 *Barb.*, 179).

It appears to me that, with respect to the sale we are now considering, it was manifestly the true interest of all concerned

that the mortgagees should not have been precluded from purchasing.

From the notices and claims interposed by the plaintiff and others, above described, and which must have been designed to prevent competition and prevent a sale, it is evident that the mortgagees only would take the risk of purchasing at any thing approaching a fair price for the property.

It would have been unjust in the extreme that the mortgagees should be compelled to stand still and see the property covered by their mortgages purchased by others at a trifling sum, and in this way lose all security for their claims. There was not the slightest impediment interposed by the mortgagees, or the person conducting the sale, to bidding. Every opportunity was afforded to secure a satisfactory sale, and in the end Ditson & Co. were forced to take the property at their bid of $10,000. They made every reasonable attempt before the property was struck down to them, by explanation through their attorney and Mr. Haynes, to meet the objections interposed, and break the force of the claims interposed, so as to invite bids, but their efforts were without avail.

The notices and claims performed their work. Ditson & Co. are not responsible for their effect. But were it otherwise and that the equity of redemption has not been extinguished by the sale, yet the mortgagees are in possession and the time for the payment of the mortgages has long since expired, the legal title in the mortgagees is complete by the terms of the instrument.

In order to redeem, the mortgagee must pay or tender the whole debt. Such payment or tender must be made or offered in good faith before suit brought (*Stoddard* agt. *Dennison*, 2 *Sweeny*, 54; *Halsted* agt. *Swartz*, 46 *How.*, 291). To enforce his equity the plaintiff must do, or offer to do, equity and that in an effective way.

It is doubtful whether this action, judged by the allegations in the complaint, is strictly an action to redeem. But if it be

regarded as such, the failure to have made any tender before suit brought is not satisfactorily excused.

The complaint does ask for an accounting, but the facts of the case do not satisfactorily show that in order to place himself in an attitude to ask for equitable relief such accounting is necessary.

The plaintiff was himself in possession of facts sufficient to enable him to make a tender before suit brought if it was his design to redeem the property. Nor do I think that this action can be maintained for an accounting.

The evidence shows substantially that the items of profit to be distributed under the printing contract were known when any amount of printing was done, and that Hall & Son were advised thereof at the time. And again, in December, 1876, Ditson & Co. and the plaintiff went over the accounts and agreed upon a balance.

This was upon an occasion when all the matters between them was the subject of discussion preparatory to a contemplated settlement. The amount due on the mortgages was reached, as was the credits in favor of Hall & Son, from all sources. No errors are stated in the complaint with regard to the result then reached, nor do any in fact now appear. The amount of indebtedness in favor of Ditson & Co. was presumptively correct.

In an agreement, made the 29th December, 1876, between Thomas J. Hall, the plaintiff, and Ditson & Co., the amount of their claim is stated at $21,000. This was after the examination of the accounts made by the parties. Under such circumstances, and in view of the fact that Ditson & Co. on the trial offered to relinquish their entire claim for a deficiency, amounting to $11,000 and upwards, I cannot think the action should be retained for such purpose. Nor do I think that the action should be held to try the title of the defendant James F. Hall to any portion of the property. That is a question between James F. Hall and Ditson & Co. to be determined in an appropriate action in their behalf.

As the plaintiff is not found to have any just ground or cause for equitable relief, the action cannot properly dispose of rights between the co-defendants not related to the causes of action disclosed in the complaint.

If the defendant James F. Hall has any claim to the property, through a title superior to that of the mortgagors, he must assert it in an independent action brought for the purpose of enforcing his claims and rights. These rights are not involved in the question whether the plaintiff may redeem by paying the mortgages, or whether the sale should be set aside for the reasons stated, or whether the plaintiff should have an account. And a result being reached adverse to the plaintiff's claims the complaint must be dismissed, with costs, without prejudice to the right of James J. Hall to take and maintain any action in the premises he may deem advisable to assert any right or claim he may have to the property, or any part thereof. And it may be that it was too late after a sale under a chattel mortgage, by which the equity of redemption of the mortgagor has been extinguished, to raise the question of usury in the original transaction, and especially in the manner in which it is interposed herein by a defendant against the claims of a co-defendant. But I deemed it advisable to disregard that objection and to consider that question in consideration with the subject to which it is in a measure kindred, although not disclosed by the complaint nor a part of the plaintiff's cause of action.

The complaint of the plaintiff is dismissed, as is that of the co-defendants of Ditson & Co. against them. The defendant will recover costs against the plaintiff, but not as to his co-defendants.