(162 App. Div. 301)

WEST et al. v. GUARANTY TRUST CO. OF NEW YORK et al.   (No. 5730.)

(Supreme Court, Appellate Division, First Department.   May 1, 1914.)

1. INJUNCTION (§ 163*)—TEMPORARY INJUNCTION.

Ordinarily, if it appears prima facie that plaintiff has equities which would be lost if a temporary injunction was not continued, and that no material injury would result to defendant by continuing it, the injunction will be continued until the issues are tried.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 357–371; Dec. Dig. § 163.*]

2. RAILROADS (§ 138*)—CONTRACTS.

Two railroad companies, who severally owned certain franchises and terminals, agreed to convey their property to a terminal corporation organized with a capital of $2,000,000, to be equally divided between the grantors and placed under a voting trust. The contract further provided that the terminal company should issue $15,000,000 of bonds, a part of which was to be issued to the contracting parties, and should lease its properties to the railroad companies, that each party should provide, satisfactorily to the other, for the payment of one-half the interest on the bonds, and "to that end" either might nominate another railroad company to use in its stead the facilities of the terminal company at such rentals as might be agreed upon between such party and its said nominee. The voting trust agreement recited that the railway companies desired to secure their mutual protection in the premises and also the fulfillment of the purposes of the lease, and provided that the railway companies should deposit with the trust company 9,985 shares of the terminal stock which should be voted as directed by them, and upon their failure to make a joint direction the trustee should vote it in such manner as would in its judgment serve the best interests of the terminal company, and it was further provided that if either party should default in interest on the terminal bonds, or in the payment of one-half of the interest and principal as agreed, and such default should continue for three months, "then, as a penalty therefor, any such default of either of the railroad companies shall operate as a forfeiture of the shares of the capital stock of the terminal company originally deposited with the trustee by such defaulting railroad company and shall vest the same in the other." *Held*, that the deposits of stock with the trust company were not made as security for the performance of the obligations of the depositing company, but were made to protect each party in the possession and control of its interest in the terminal properties, and to preserve the contractual relations of the parties and prevent an undesirable lessee from being brought into the control of the properties, and hence the forfeiture provision was not invalid under the rule "Once a mortgage, always a mortgage."

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 436–439; Dec. Dig. § 138.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. RAILROADS (§ 38*)—CONTRACTS.
   Whether the forfeiture provision should be given the effect of a condition absolute should be determined by the intention of the parties as ascertained from the terms of the agreement and the subject-matter.
   [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 95; Dec. Dig. § 38.*]

4. EQUITY (§ 24*)—FORFEITURES. ·
   Equity abhors forfeitures and will always seek to avoid them.
   [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 69-76; Dec. Dig. § 24.*]

5. EQUITY (§ 24*)—FORFEITURES.
   The rule that equity will prevent a forfeiture by a construction of the contract, so as to obviate it, does not extend beyond cases where there is no reason to conclude that the conditions were inserted to stand as security for the performance of an obligation, damages for a breach of which are susceptible of ascertainment by a definite rule, or where the doing of a particular thing was not the principal object of the condition.
   [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 69-76; Dec. Dig. § 24.*]

6. EQUITY (§ 24*)—FORFEITURES—ENFORCEMENT.
   Where the parties have clearly provided for a forfeiture, and it would violate their agreement and work injustice to restrain its enforcement, equity will not prevent the enforcement of the forfeiture.
   [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 69-76; Dec. Dig. § 24.*]

7. INJUNCTION (§ 108*)—CONDITIONS PRECEDENT.
   The enforcement of a forfeiture provision contained in a voting trust agreement between two. railroad companies which had organized a terminal company for their use, to the effect that any default in the payment of its proportionate part of the interest on the terminal company's bonds should "as a penalty therefor" operate to forfeit the defaulting company's deposit of capital stock with the trustee, will not be enjoined at the suit of the defaulting company, unless it tenders the rent as to which it is in default.
   [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 184-186; Dec. Dig. § 108.*]

Appeal from Special Term, New York County.

Action by Thomas C. West and others, as receivers of the St. Louis & San Francisco Railroad Company, and another, against the Guaranty Trust Company of New York, the Southern Railway Company, and others. From an order (83 Misc. Rep. 609, 145 N. Y. Supp. 634) granting a temporary injunction, the Southern Railway Company appeals. Reversed, and motion denied.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

Francis Lynde Stetson, of New York City, for appellant.
Francis D. Pollak, of New York City, for respondents.

HOTCHKISS, J. Plaintiffs bring this action, as receivers of the St. Louis & San Francisco Railroad Company (hereinafter called the "Frisco Company"), against the Southern Railway Company and the Guaranty Trust Company, as successor of the Standard Trust Company, to enjoin the making or accepting delivery of certificates for

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

9,985 shares of stock of the New Orleans Terminal Company deposited by the Frisco Company with the Standard Trust Company, under a voting trust agreement, and from declaring any forfeiture in respect thereof, and from executing any assignment of conveyance thereof. The motion for the injunction was based on the complaint and affidavits. It was heard before answer and was opposed on affidavits read in behalf of defendants.

[1] Ordinarily, in this situation, if it appeared, prima facie, that the plaintiffs had equities which would be lost if the injunction was not continued, and particularly where, as here, no material injury would be suffered by the defendant by such continuance, the injunction would be held until the issues had been framed and tried. But inasmuch as it is conceded that the rights of the parties are wholly expressed in writings which are now before the court, and that the question presented is one of law only, there is no objection to its present determination.

The facts are as follows:

In 1903, the Frisco Company and the Southern Company severally owned certain interests, franchises, and terminal facilities in the city of New Orleans. On March 17th of that year, the two companies entered into an agreement providing that all of the interests of both companies should be consolidated and conveyed to a corporation to be known as the New Orleans Terminal Company, the capital of which should be $2,000,000, to be divided equally between the parties; that all of the capital stock except shares necessary to qualify directors should be placed by the several parties, under a voting trust agreement. Each of the parties was to have equal representation on the board of directors of the Terminal Company "unless otherwise agreed hereafter." It was further provided that the Terminal Company should issue its 4 per cent. 50-year bonds to the amount of $15,000,000 secured by a first mortgage upon its properties, sufficient of which bonds were to be issued to the several contracting parties to reimburse them for the cost of their respective properties to be conveyed to the Terminal Company, and the remainder should from time to time be issued in such amounts as might be necessary to pay for the cost of developing the Terminal properties; that the Terminal Company should lease its properties to the several parties for a period of not less than the life of the proposed bonds, which lease was to confer upon the several parties the right to use the Terminal in common. Section 8, more particularly alluded to hereafter, provided, among other things, that, under restrictions clearly expressed, each party might nominate another company "to use in its stead the facilities of the Terminal Company at such rentals as may be agreed between such party hereto and its said nominee or nominees." Provision was also made for the admission by the unanimous consent and upon terms unanimously approved by the board of directors of the Terminal Company, of other companies, to the use of the facilities furnished by the Terminal. In addition to an annual rental equivalent to the interest on the outstanding bonds, the operating expenses, taxes, and assessments were to be paid by the actual lessees on a "wheelage

basis." The lease or leases from the Terminal Company were to prohibit each lessee from selling, assigning, transferring, mortgaging, or incumbering its lease or underletting the whole or any part of the demised premises without the consent of the Terminal Company expressed by the unanimous resolution of its board of directors, and this provision was to extend not only to any voluntary alienation or incumbering of the lease, but to any such result obtained "by any proceedings at law or in equity or otherwise."

This executory agreement was consummated by the transfer of the several Terminal properties of the contracting parties to the New Orleans Terminal Company organized in pursuance of the foregoing contract with a capital of $2,000,000 divided into 20,000 shares of the par value of $100 each. Shortly prior to July, 1903, there was executed and delivered the first mortgage of the Terminal Company. Of the $15,000,000 of bonds secured thereby, $14,000,000 were from time to time certified and are now outstanding. Of these bonds $3,-000,000 were issued to the respective railway companies in proportion to the cost to each of the several properties conveyed to the Terminal Company. On July 1, 1903, the contemplated lease was executed, and its provisions followed substantially the terms of the agreement in pursuance of which it was executed. By it the two railway companies jointly and severally guaranteed the payment of principal and interest of the Terminal mortgage bonds, and, in addition to certain rentals representing operating expenses and certain fixed charges which were to be borne equally, the lessees severally and not jointly agreed to pay semiannually to the trustee under the mortgage an amount equal to one-half of the semiannual interest on the outstanding bonds of the Terminal Company, and that at the maturity of such bonds each should pay one-half of the principal. The lease is very full and formal and contains many covenants on the part of the lessees, all of which are expressed to be several and not joint.

On December 31, 1903, the contemplated voting trust agreement to the Standard (Guaranty) Trust Company was executed by the two railway companies, by which each deposited with the Trust Company 9,985 shares of the Terminal Company stock. This agreement, among other things, recites that "the railway companies desire to secure their mutual protection in the premises and also the fulfillment of the purposes and intent of all of the provisions of" the lease of July 1st. Under this agreement, the trustee is among other things to vote the deposited stock as directed by the railway companies, and, in the event of their failure to make a joint direction, "the trustee shall vote the stock in such manner as will in its judgment serve the best interests of the Terminal Company." In accordance with the original agreement of March, 1903, the voting trust agreement provides that no part of the trusteed stock should be transferred by the trustee without the unanimous consent of the parties. It also provided that, in the event either party should default in payment of any installment of interest that may become due on the bonds of the Terminal Company (the Terminal Company having likewise defaulted), or if either should default in the payment of one-half the interest and prin-

cipal of the bonds as per the joint guaranty thereof, and if such default should continue for three months after written notice by the trustee to the defaulting railway company "then as a penalty therefor, any such default of either of the railway companies shall operate as a forfeiture of the shares of the capital stock of the Terminal Company originally deposited with the trustee by such defaulting railway company and shall vest the same in the other," and thereupon the trustee shall execute instruments declaring such forfeiture which shall be conclusive evidence thereof and will assign to the railway company not in default, or upon its order, all of the shares and deliver the same to such railway company.

From the inception of the foregoing arrangements up to the insolvency of the Frisco Company the two railway companies co-operated harmoniously in the administration and use of the New Orleans Terminal, each company punctually conforming to its agreement to pay its share of the interest on the outstanding bonds of the Terminal Company, the Frisco Company so paying upwards of a million of dollars. Receivers having been appointed of the Frisco Company, on June 15, 1913, it made default in the payment of $140,000 then due as its proportion of the semiannual interest on the outstanding Terminal bonds, which sum, as I have said, was due as rental, by virtue of the lease, and also in consequence of the Frisco Company's several guaranty. The Southern Company provided all of the moneys necessary for the payment of such interest and thereupon sought to forfeit to its own use the shares of the Terminal stock deposited by the Frisco Company with and held by the trustee under the voting trust agreement, and caused the trustee to serve upon the receivers notice to that end, which forfeiture it is the purpose of this action to enjoin.

From the uncontroverted affidavits it appears that the Frisco Company is not using and has not used the terminals for some considerable time, but that in its place and stead the same are being used by the New Orleans, Texas & Orient Railroad Company as its nominee, and that the Frisco Company's proportion of the current operating expenses, taxes, etc., have been paid, but nothing further. It also appeared without contradiction that, at the time the Frisco Company made default, there were outstanding and uncompleted certain construction contracts, and that there were then ready to be let other contracts all pertaining to work essential to the proper use of the Terminal property and its development in accordance with the original purpose and plan of the parties, and that these contracts have already entailed upon the Southern Company the necessity for providing the money (presumably from the sale or pledge of bonds) for their completion, and that further moneys will in like manner have to be provided in the near future for the same purpose.

The theory of the complaint is that as matter of law the shares in question were deposited as security for the performance on its part of the pecuniary obligations assumed by the Frisco Company under the lease and the joint guaranty with respect to the payment of interest and principal of the bonds of the Terminal Company; that

provision for the forfeiture of the shares is void under the equitable principal of "once a mortgage, always a mortgage." The complaint alleges no tender of any sort or offer to do equity.

[2] The position of the Southern Company is that the shares of stock in question were not deposited as security for the money obligations of either party, but that such deposit and the provision for the forfeiture of the shares were a means of protecting each party in the possession and control of the Terminal properties or its interest therein, and as a means of preserving the contractual relations of the parties as set forth in the original agreement of consolidation and of preventing either party, in case of the default of the other, from having an undesirable associate and colessee thrust upon it against its consent. I think this view should prevail.

[3] Whether the provision for forfeiture of the stock shall have the effect of a condition absolute should be determined by the intention of the parties, to be collected not only from the terms of the agreement, but from the subject-matter to which it relates. Bank of Montreal v. Recknagel, 109 N. Y. 482, 491, 17 N. E. 217. The voting trust agreement was a mere incident of the original consolidation agreement and was executed in pursuance of the provisions therein contained. It is apparent from this original contract and of the lease subsequently executed in pursuance thereof that the parties sought by unmistakable language to prevent the assignment by either party of its interest in the Terminal Company and its properties, and as well any assignment or other arrangement by which either party should alienate its interest in the lease or admit any third corporation to participate in the use of the terminal properties or any part thereof, unless such act was consented to by the other. The character of the enterprise made such joint and unanimous use and control of the property an important feature of the consideration inducing the several parties to promote the enterprise. The consolidation of the two separate properties originally owned by the several railway companies, their conveyance to a single corporation, the method, manner, and means for their development, and the adaptation of the same to the peculiar necessities or uses of each of the parties, their subsequent harmonious operation and control, the times, conditions, and terms on which the bonds of the Terminal Company should be sold for the purpose of providing the means necessary for the development of the properties, and as well the financial ability which each company believed the other to possess to enable it to bear its part of the pecuniary obligations it assumed, may well have been material if not controlling circumstances inducing the several companies to enter the combination and execute the agreement therefor.

It requires no stretch of imagination to understand how a corporation might be well satisfied to undertake an enterprise of this character, provided it was permitted to discriminate and select an approved associate with which its relations should be strictly defined and carefully guarded, whereas it would under no circumstances for a moment consider any such association with another and less desirable company, and how when entering into an agreement of the char-

acter of that in question each party would seek by every means in its power to provide against the voluntary or involuntary disruption of the copartnership and the forcing of one upon the other of an unsatisfactory associate. These provisions against assignability were both lawful and reasonable. The fact that the deposit of stock was not intended in any sense as security for the pecuniary obligations of either party, and that the arrangement for a forfeiture was one intended to secure and perpetuate joint control in the original parties or absolute control in the other should one default, is strengthened by several further considerations.

At the outset it will be noticed that there is no express provision in any of the instruments to the effect that the stock is pledged as security for money obligations only. It is not surprising therefore that there is no agreement for the sale of all or part of the shares, to pay the amount of any debt then in default; nor provision, in case of surplus, for the disposition of any balance of the stock, or for any future rights of the defaulting company in unsold stock, or for the disposition of any surplus or for liability for any deficit. In brief, the agreement totally lacks any words appropriate or reasonably necessary to direct what should be done with the stock, in the event of a money default. On the contrary, the concise wording of both the original agreement and the voting trust agreement with respect to forfeiture of the stock is peculiarly apt to express the intent to forfeit on the mere happening of the default provided for. While ordinarily, in single contracts between individuals for the loan of money, the inclusion of words of forfeiture and the exclusion of provisions for sale, etc., would not, in an action to avoid the forfeiture, be of material importance, in the case of these two railway companies formally contracting with respect to a large and complicated enterprise, entailing the issue of obligations to a very large amount the liabilities on account of which extended over 50 years, the drafting of the several instruments by which the purposes of the parties were expressed demanding and doubtless securing the services of skilled counsel, able executives, and in due course passing the scrutiny of separate boards of directors, the failure of the agreements to refer to or in any way to make provision for the contingencies arising in case of default, if any such were deemed appropriate to the intention of the parties, is to my mind very significant.

One of the provisions of the original agreement of March, 1903, seems to me to have a particularly important bearing on the question of the security, and the only security which the parties contemplated, for the payment of its obligations on account of the bonds. Section 8 says:

"That each of the parties  *  *  *  will provide in such manner as shall be satisfactory to the other party for the payment of one-half of all interest as it shall accrue upon all of the bonds  *  *  *  to that end either party may nominate another railroad company or companies, to use in its stead the facilities of the Terminal Company at such rentals as may be agreed between such party hereto and its said nominee or nominees; provided always that the said interest charge is satisfactorily provided for as aforesaid," and that such nominee is satisfactory to the other party.

This apparently is an express provision for the relief of either party by substitution of a nominee who in its place will bear a proportion of the rent equal to its share of the interest. In the light of this provision, the exclusion of all words providing for the stock being pledged or deposited as security for any party of the bond obligations assumes considerable importance. President, etc., Del. & H. C. Co. v. Penn. Coal Co., 50 N. Y. 250, 260; Beardsley v. Hotchkiss, 96 N. Y. 201, 213.

Another fact brings into clearer relief both the exclusiveness of section 8 and the failure of the parties in terms to express that the stock was deposited as security for any money obligation resting on the bonds. It is apparent that, when issued, the stock represented no money investment by either party because the original cost of each with respect to the individual properties contributed to the consolidation and, as well, all additional cost of construction and development of the Terminal, was provided to be paid for from the proceeds of bonds. Presumably, therefore, at the time it was issued the $2,000,000 of capital stock of the Terminal Company represented no substantive money value whatsoever, and, as commonly occurs, the ownership and control of the stock may well have been deemed valuable only because it afforded control of the corporation and the management of its affairs. It is evident that the money value of the shares of stock deposited by the several parties bore but small proportion to the pecuniary obligations assumed by each with respect of the bonds.

It would seem idle to argue that this huge liability was sought to be protected by the deposit of the stock. And yet if the arrangement of the parties is to be construed as claimed by the plaintiffs, and if the sole or principal object of the deposit of the stock was to indemnify the nondefaulting party for the pecuniary obligations which it assumed or with which it might be saddled on default of the other, in short, if the deposit of stock amounted to a pledge or mortgage to secure pecuniary obligations rather than as a pledge or forfeit to secure the contractual status of the parties, then, if it is declared to be such a mortgage, title to the stock and unrestricted control and disposition thereof can only be obtained by the Southern Company by foreclosure and sale, thus offering the opportunity of purchase by a stranger and so accomplishing the injection into the enterprise of a third party, which contingency the parties by their original agreement so undertook to prevent, going so far as to provide not only against objectionable voluntary assignments or alienations but as well against alienation resulting by operation of law. Or if foreclosure is not had, then although refusing to bear any of the obligations of the lease with respect to interest on the bonds, if plaintiffs' position is sound, the Frisco Company may continue in its use and benefit of the Terminal and as well to exercise the right to direct the trustee how to vote its portion of the deposited shares and otherwise to enjoy proprietorship of the stock so far as reserved to it under the voting trust agreement.

[4, 5] It is, of course, true that equity abhors forfeitures and will always seek to find means for their avoidance. But the rule of equity

which aids parties to escape from the legal effect of the precise words of their contracts and seeks to give them an interpretation more consistent with principles of justice, to the end that parties may be relieved against forfeitures, is not one of universal application.    See Pizer v. Herzig, 120 App. Div. 102, 105 N. Y. Supp. 38; Cole v. Hinck, 120 App. Div. 355, 356, 105 N. Y. Supp. 407; Haines v. Barber, 113 App. Div. 696, 703, 704, 100 N. Y. Supp. 75.  It does not extend beyond situations where there is no reason for saying that the conditions were inserted to stand as security either for the payment of money or the performance of some promise, damages for a breach of which are susceptible of ascertainment by some definite rule; or where the doing of a particular thing or the doing thereof at a particular time was not the principal object of the condition Noyes v. Anderson, 124 N. Y. 175, 26 N. E. 316, 21 Am. St. Rep 657; Klein v. Insurance Co., 104 U. S. 88, 26 L. Ed. 662; Maginnis v. Knickerbocker Ice Co., 112 Wis. 385, 88 N. W. 300, 69 L. R. A. 833; Potomac Power Co. v. Burchell, 109 Va. 676, 64 S. E. 982; Springfield, etc., Traction Co. v. Warrick, 249 Ill. 470, 94 N. E. 933, Ann. Cas. 1912A, 187.

[6] Where the parties have clearly provided for a forfeiture to restrain which would not only violate their agreement but would work wrong and injustice, equity will not contribute to such a result nor write for the parties a contract different from that which they have made.    Kann v. King, 204 U. S. 43, 27 Sup. Ct. 213, 51 L. Ed. 360.

Plaintiffs lay much stress on the fact that, unless forfeiture of the stock is enjoined and the agreement for its deposit declared a pledge or mortgage, the Frisco Company will be deprived of all equity of redemption in the Terminal property, notwithstanding its obligation under the lease or upon its guaranty of the bonds will continue. What may be the legal effect of these obligations of the Frisco Company is not before us, and we should not undertake to decide questions arising therefrom.    But it is apparent that the dire results predicted may not come to pass.  So far as any such obligations may grow out of the relations between the parties themselves, as distinguished from liability under the guaranty of the bonds, it may be observed that ordinarily, where a mortgagee forfeits the pledge for the debt, the debt is thereby extinguished.  Bronson v. Founders Co., 128 Ill. App. 552.  Or, having regard for the terms of the lease, and recalling the provision whereby the Trust Company may convey the shares in enforcement of the forfeiture, it may be that a situation is presented analogous to that arising between landlord and tenant in leases reserving a right of re-entry, in which case the reservation of the right to re-enter is in doubtful cases commonly regarded as determinative of the question whether the words of the lease are to be construed as a covenant giving rise to an action for damages or a conditional limitation justifying forfeiture, and a vesting of the whole estate in the lessor.  Such a re-entry precludes the right to recover rent thereafter accruing, unless the parties have in unequivocal terms agreed to the contrary.  Hall v. Gould, 13 N. Y. 127; Underhill v. Collins,

132 N. Y. 269, 30 N. E. 576; Lamson, etc., Service Co. v. Bowland, 114 Fed. 639, 52 C. C. A. 335. In case of forfeiture, should the Southern Company secure another cotenant in use of the Terminal property, the Frisco Company will necessarily have the benefit of whatever annual rent such tenant may pay as against the Frisco Company's liability for bond interest. Furthermore, if the Terminal property is of so much greater value than the bonds outstanding, as plaintiffs allege, their fear of liability for the principal of the bonds is groundless.

[7] Another feature of the case remains to be considered. The complaint rests upon the sole theory that the stock was deposited as security for a pecuniary obligation and that the action may be maintained without tendering the rent for which the Frisco Company is in default and which the Southern Company has been forced to pay. The action stands as one to restrain the attempted forfeit of the stock only, and not one to restrain and redeem. Assuming that plaintiffs' construction of the contract were sound, whether the action could be maintained, especially without such tender, is very doubtful. Hall v. Ditson, 5 Abb. N. C. 198. No controlling authority in this state on this point has been cited, and the authorities in other jurisdictions seem to be in conflict. We are not required to decide this. If the deposit was not solely to secure pecuniary obligations, but was, assuming the most favorable view of which I think the case is susceptible so far as plaintiffs are concerned, namely, that the deposit was intended both as security for pecuniary obligations and as well a means of enforcing and retaining the contractual status of the parties, can plaintiffs have relief without tendering some equivalent for the latter, as for instance by nominating a satisfactory railroad company, if that were possible, to take its place and assume its obligations? May plaintiffs repudiate or ignore material obligations which the contract imposes upon the Frisco Company and base a successful prayer for relief upon those only which seem least burdensome? The answer cannot be doubtful. New York, etc., R. Co. v. New York, 1 Hilton, 562, 567, 587.

The order should be reversed, with costs and disbursements, and the motion denied, with $10 costs.

CLARKE, SCOTT, and DOWLING, JJ., concur.

INGRAHAM, P. J. I concur with my Brother HOTCHKISS in his opinion, as he has demonstrated that the various agreements between these railroad companies and the New Orleans Terminal Company were not intended as security for the payment of the various installments of interest as they should become due, or for the performance of the obligations assumed by the railroad companies, but that the sole object of the whole transaction was to secure to the contracting railroad companies certain terminal facilities in the city of New Orleans so long as both companies should meet the necessary obligations which were required to attain that object, and upon the failure of either company to fulfill such obligations the company not

in default should be entitled to control and use such facilities. The Terminal Company was organized to accomplish that purpose. Its whole capital stock was issued to the trust company as trustee by an agreement between the parties. The trustee was to devote that stock as required by the railroad companies. The stock was not separated so that one half of it belonged to one company and the other half to the other company; but it was to be held by the trust company as trustee for the mutual benefit of the contracting parties so long as each of the contracting parties performed the obligations which it had assumed. Under the lease from the Terminal Company, the right to use the interests of the Terminal Company depended entirely upon the performance of such obligations, and the company in default at once lost its right to use the property or to control the stock held by the trust company as trustee, and the railroad company not in default became vested with the title to all the stock in the hands of the trustee. This stock represented no outlay by either company, and the parties, by the most elaborate provision, had agreed that no other corporation or individual could use these facilities, except with the mutual consent of both parties to the agreement. So that under these agreements I cannot see that the title to any portion of this stock ever vested in the Frisco Company. That company had the right to use the terminal facilities so long as it complied with the obligations which it had assumed, but its right to use the property, or to have any interest in the stock being conditioned upon the performance of such obligation, by the express provision of the contract between the parties any right to either the stock or the terminal facilities terminated upon its default. It is not intended to question the power of a court of equity to relieve from a forfeiture or penalty, or to give to any party to such a contract a right to redeem; but this action is not to obtain such relief. The plaintiffs do not seek to subject themselves as receivers to the obligations imposed upon the railroad companies by the contracts in question, and have neither offered nor now offer to comply with the obligations as to which they have defaulted.

And so it seems to me that, admitting all the allegations of the complaint, the plaintiffs would not be entitled to judgment in their favor; but in addition to this it seems to me that the plaintiffs have no standing in court to any judgment enforcing this contract. One of the contracting parties was the Frisco Railroad Company. That company has become insolvent, and the plaintiffs have been appointed receivers of its property. Upon their appointment as receivers they had a right to adopt this contract and undertake as receivers to carry it out, in which event they would be entitled to the advantages of the contract on complying with the obligations imposed upon the railroad company of which they were receivers. The record shows, however, that they have refused to accept the contract and have refused to be bound by its conditions. They were not bound to take it over, not bound to accept the property rights which were secured to the railroad company by the contracts, and, having absolutely and intentionally refused to accept the contract and its obligations, I do not under-

stand that they are in a position in a court of equity to enforce the contract as against the other contracting parties. It seems to me that the case is analogous to a lease of real property by which a lessee is entitled to the use of the property upon payment of rent, or a compliance with other conditions. The receiver of the property of the lessee is not obliged to take possession of the property and accept the lease with its obligations. If he accepts it, he is bound by the terms and conditions of the lease; but, if he refuses to accept it and refuses to comply with the terms and obligations imposed upon the tenant, he certainly cannot appear and object to the landlord of the premises resuming possession of the property and terminating the lease. The San Francisco Railroad Company is not a party to this action and asks for no relief. The receivers who have repudiated the contract and refused to be bound by its terms and conditions now ask to restrain the other parties to it from proceeding under it and enforcing it as against the defaulting railroad company. It seems to me clear that under those conditions the receivers have no standing in court to enforce the contract, and therefore cannot maintain this action.